25CA0356 Peo in Interest of Zambrano 05-08-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0356
Pueblo County District Court No. 24MH30123
Honorable Scott B. Epstein, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Joshua D. Zambrano,

Respondent-Appellant.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE PAWAR
Lipinsky and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 8, 2025

---

Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1    Joshua D. Zambrano appeals the district court's order authorizing the involuntary administration of antipsychotic and mood-stabilizing medications.  We affirm.

## I.    Background

¶ 2    Zambrano was committed to the Colorado Mental Health Hospital in Pueblo (CMHHIP) after being found incompetent to proceed in a criminal case.  He was diagnosed with schizophrenia and presented with symptoms including delusional ideations, paranoia, impulsiveness, and disorganization.  Zambrano was administered emergency medication after he became verbally aggressive and physically assaultive to CMHHIP staff.  Thereafter the district court granted the People's petition for the involuntary administration of Zyprexa and Depakote.

¶ 3    Over the following two months Zambrano continued to experience psychotic symptoms that affected his thinking and behavior.  He continued to display assaultive behavior, which necessitated a request by his treatment team to change his court-ordered antipsychotic medication.  At the request of CMHHIP staff psychiatrist Dr. Hareesh Pillai, the People petitioned the district court to authorize the involuntary administration of risperidone

(Risperdal), olanzapine (Zyprexa), haloperidol (Haldol), and valproic acid (Depakote).

¶ 4      The district court held an evidentiary hearing at which Dr. Pillai and Zambrano testified. Dr. Pillai explained Zambrano's disorder and accompanying symptoms. He described the requested medications, their possible side effects, and their necessity in treating Zambrano's symptoms. Also, during the hearing Dr. Pillai withdrew his request for the involuntary administration of Depakote and added a request to treat Zambrano with UZEDY, a long-acting monthly injectable formulation of Risperdal.

¶ 5      Zambrano denied having a mental illness. He also described the side effects he had experienced since taking the requested medications and his general preference not to take any medication.

¶ 6      Finding that Dr. Pillai testified "credibly and . . . very persuasively," the district court granted the petition and entered an order authorizing the involuntary administration of Risperdal (orally or by nasogastric "NG" tube daily) or UZEDY (intramuscularly "IM" monthly), Zyprexa (orally or IM daily), and Haldol (orally or IM daily).

## II. Legal Principles and Standard of Review

¶ 7 An involuntarily committed person retains the right to refuse treatment. *See People v. Medina*, 705 P.2d 961, 971 (Colo. 1985). Even so, a court may authorize the involuntary administration of medication if the People prove the following elements by clear and convincing evidence:

> (1) the patient is incompetent to effectively participate in the treatment decision;
>
> (2) treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution;
>
> (3) no less intrusive treatment alternative is available; and
>
> (4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override his bona fide and legitimate interest in refusing treatment.

*Id.* at 973. We determine whether the evidence, viewed as a whole and in the light most favorable to the People, is sufficient to support the court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. A physician's testimony alone may be sufficient to satisfy the *Medina* test. *Id.* at ¶ 30.

3

¶ 8    Applying the *Medina* test presents a mixed question of fact and law, meaning we defer to the district court's factual findings if supported by the record but review its legal conclusions de novo. *People in Interest of R.C.*, 2019 COA 99M, ¶ 7.  It is for the district court, as the fact finder, to determine witness credibility; the sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn from it.  *Id.*

## III.    Discussion

¶ 9    Zambrano does not contest the district court's findings on the first and second *Medina* elements.  But he contends that the People did not present sufficient evidence to prove the third and fourth *Medina* elements.  We disagree.

### A.    The Third *Medina* Element

¶ 10    The third *Medina* element requires a court to determine that no less intrusive alternative to the proposed medication is available. *Medina*, 705 P.2d at 973.  This element "encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition."  *Id.* at 974.  A less intrusive alternative is "an

4

available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed treatment." *People in Interest of Strodtman*, 293 P.3d 123, 133 (Colo. App. 2011).

¶ 11    Dr. Pillai testified that when Zambrano began refusing all medications, he was given IM backups of Zyprexa and NG backups of Depakote.  However, the NG backup of Depakote was discontinued after about eight days because the repetitive placement of the NG tube caused "extreme bleeding" from Zambrano's nasal passages and "it was determined that the risk of daily [NG] tube placement outweighed any benefits."  And while Dr. Pillai removed his request to administer an NG backup of Depakote, a portion of the treatment plan includes the possibility of administering an NG backup of Risperdal should Zambrano refuse the oral administration.

¶ 12    Based on this testimony, Zambrano contends that there are less intrusive alternatives to the portion of the treatment plan that involves administering Risperdal through an NG tube.

¶ 13    First, Zambrano alleges that involuntary administration of Risperdal could be forgone altogether based on Dr. Pillai's testimony

that he had not observed "any acute signs of psychosis or mania" since the treatment team decided to stop the administration of Depakote and treat only with Zyprexa.

¶ 14    True, Dr. Pillai testified that he had not observed any acute signs of psychosis or mania since the treatment team decided to stop the administration of Depakote. But Dr. Pillai also testified that "at this point in time, it does not appear that the Zyprexa is effectively treating [Zambrano's] underlying symptoms." Dr. Pillai explained that while "[Zambrano] has improved from his significant impulsivity, disorganized thinking, and extremely psychotic presentation[,] . . . he continues to have underlying symptoms that affect his behaviors." For example, Dr. Pillai testified that Zambrano "continues to have treatment-resistant symptoms, psychosis, including ongoing delusions and paranoia. And this makes him a danger to others."

¶ 15    Further, when asked whether Zambrano could be treated with Zyprexa alone, Dr. Pillai opined that he could not. Dr. Pillai explained that while Zambrano had been on therapeutic dosages of Zyprexa and, for the most part, Depakote since the last court order for involuntary medication, he "continues to have treatment

resistant symptoms that influence his behavior." Moreover, Dr. Pillai did not expect Zambrano to voluntarily take Zyprexa "given his refusals over the past few weeks." Thus, we disagree that the evidence presented at the hearing supports a finding that Zambrano could be treated successfully with Zyprexa alone.

¶ 16    Next Zambrano asserts that Haldol could be used in place of Risperdal with an NG tube based on Dr. Pillai's testimony that Haldol is "similar to Risperdal." But as we understand Dr. Pillai's testimony, the treatment plan would be to first administer an oral dose of Risperdal to see if Zambrano is able to tolerate this medication. And so long as there were "no acute side effects or adverse reactions, like allergic reactions," UZEDY, a long-acting monthly injectable formulation of Risperdal, would then be administered. Dr. Pillai also testified that Haldol, which is "similar to Risperdal," would be used "as an IM backup for any oral refusals." Thus, it appears already part of the treatment plan that Zambrano would be given Haldol only if he refused the oral administration of Risperdal.

¶ 17    But even if Dr. Pillai elected to administer the NG form of Risperdal after an oral refusal, Dr. Pillai explained that Zambrano

only needed "two to three days of oral medication compliance" to account for any possible adverse reactions before UZEDY could be administered. And the "extreme bleeding" from Zambrano's nasal passages resulted after "eight or nine days" of repetitive placement of the NG tube.

¶ 18 Crediting Dr. Pillai's testimony and explicitly adopting his opinions, the district court found that there were no "less intrusive treatment alternatives available" and "[t]he psychiatric medications are the only form of treatment that can effectively treat [Zambrano's] mental illness, at this time." Because the record supports the court's determination, we will not disturb it and, to the extent Zambrano asks us to second-guess witness credibility or draw different inferences from the testimony, we decline to do so. *See R.C.*, ¶ 7.

B.    The Fourth *Medina* Element

¶ 19 The fourth *Medina* element is whether the patient's need for treatment is sufficiently compelling to override any legitimate interest in refusing treatment. *Medina*, 705 P.2d at 974. In assessing whether this element is satisfied, a court must consider "whether the patient's refusal is bona fide and legitimate" and, if it

is, "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution." *Id.* at 974.

¶ 20    The district court found that there was not a "bona fide or legitimate reason to refuse the medication." The court noted that Zambrano's stated reason for refusal was generally that he "doesn't like medications" and "he claims he's a conservative Christian, and, as such, does not believe in taking pharmaceuticals" but "is voluntarily taking the Zyprexa," which "seems inconsistent."

¶ 21    Zambrano alleges that in addition to his religious preferences, he has a legitimate interest in avoiding severe side effects. In particular he points to the testimony at the hearing concerning the use of the NG tube and its associated side effects — namely, his testimony that he had "been definitely experiencing breathing problems since the NG tubes were used" and Dr. Pillai's testimony that using the NG tube to administer Risperdal "could cause some difficulties with breathing due to just irritation of the nasal passages."

¶ 22    Avoiding unwanted or harmful side effects from medications is a bona fide and legitimate reason for refusing treatment.  *See id.* ("The patient's refusal may stem from a prior unfavorable experience with similar treatment . . . .").  Thus, the district court erred by concluding that Zambrano's reasons for refusing the requested medications were not bona fide and legitimate.  However, the court went on to say that, even if Zambrano had a bona fide and legitimate reason for refusing medications because a sect of his "conservative Christian religious group . . . [did] not believe in psychiatric medication, his prognosis is so unfavorable that his personal preference has to yield to the legitimate interest of the state in preserving his mental health while he's placed in their protective custody at the institution."  The record supports this determination.

¶ 23    Dr. Pillai opined that the failure to medicate Zambrano would be more harmful than the risk posed by the requested medications.  In support of this opinion, Dr. Pillai testified that, "[w]ithout the medications, he will suffer a deterioration that will significantly impact him and make him more of a danger to others."  Dr. Pillai noted that before his first round of emergency medications,

Zambrano "was assaultive and aggressive towards staff members and had punched out staff members, requiring seclusion and restraint." More recently, he punched Dr. Pillai "due to his unwillingness to take medications." Despite this, Dr. Pillai agreed that with the medications, Zambrano's symptoms improved and "in general, he has become less aggressive on the unit."

¶ 24     Dr. Pillai acknowledged that the requested medications had some potential adverse side effects. But, he explained, Zambrano would be monitored for any side effects once he started the requested medication regimen, and additional medications could neutralize some of the side effects. And Dr. Pillai opined that (1) the need to treat Zambrano with the requested medications outweighed the risk of side effects; (2) no alternative treatment would be both as effective and less intrusive than the requested medications; (3) without the medications, there would be significant and long-term deterioration in Zambrano's mental condition; (4) without the medications, Zambrano poses a serious risk of harm to others; and (5) Zambrano had no insight into his mental condition, and his refusal to take the medications was irrational and unreasonable.

¶ 25    We therefore conclude that sufficient evidence supports the court's finding that, even assuming a bona fide and legitimate reason for Zambrano's refusal of treatment, his prognosis without the requested medications is so unfavorable that his personal preference must yield to the state's legitimate interests in preserving his life and health and protecting the safety of those in the institution.

IV.    Disposition

¶ 26    The order is affirmed.

JUDGE LIPINSKY and JUDGE LUM concur.